# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 23-2075V

| | |
|---|---|
| BRADLEY WOODWARD,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br><br>Filed: December 17, 2025 |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA,* for Petitioner.

*Mark Kim Hellie, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

On December 5, 2023, Bradley Woodward filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine he received on November 25, 2022. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

Although Respondent conceded entitlement, the parties could not agree on the damages to be awarded, and have now fully briefed damages (ECF Nos. 28, 29, 31). For the reasons set forth below, I find that Petitioner is entitled to compensation in the amount

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

of $125,000.00 for his actual pain and suffering, plus $6,368.00 in lost wages, and $318.23 for unreimbursed expenses.

## I. Relevant Factual History

### a. Medical Records

On November 25, 2022, Petitioner (then 55 years old) received a flu vaccine. Ex. 1 at 2. Less than two weeks later, on December 7 and 8, 2022, he was seen in urgent care for a sore throat. Ex. 2 at 563, 574. His symptoms did not improve, and he saw his primary care provider ("PCP") the following week, on December 13th. *Id*. at 546.

One day later (December 14, 2022), Petitioner called his PCP complaining of numbness and tingling in his hands and forearms and numbness in his back. Ex. 2 at 537. Two days later (December 16th), he called again, now reporting mild blurry vision in addition to his prior symptoms, and a triage nurse directed him to go to the emergency department ("ED"). *Id*. at 534, 538.

The same day (December 16, 2022), Petitioner went to the St. Francis Hospital ED complaining of arm numbness and double vision. Ex. 2 at 524-26. He was evaluated in triage, but left without otherwise being seen. *Id*. He went to urgent care the same day, and due to his "significant symptoms" was advised to return to the ED. *Id*. at 507-10, 517. He returned to the St. Francis ED, and again was evaluated in triage and left without otherwise being seen. *Id*. at 511; Ex. 5 at ¶ 7.

The following day (December 17, 2022), Petitioner was seen at the Owatonna Hospital ED. Ex. 2 at 475. He reported numbness and decreased mobility in his bilateral upper extremities and decreased sensation to his chest and abdomen. *Id*. On examination, his bicep, brachioradialis, patellar, and achilles reflexes were absent bilaterally. *Id*. at 477. A head CT showed sinusitis but was otherwise normal. *Id*. at 488. The doctor told Petitioner that he could not rule out GBS without doing a lumbar puncture. *Id*. at 479. Petitioner stated he wanted to hold off on a lumbar puncture, explaining that he had an outpatient follow-up scheduled two days later. *Id*.

Two days later (December 19, 2022), a third party called a nurse triage line reporting that Petitioner was experiencing increased numbness and tingling in his fingertips, chest, back, and arms, with altered speech and weakness. Ex. 2 at 453. The triage nurse advised the caller to call 911. *Id*. Petitioner was then transported to the ED by ambulance. Ex. 4 at 5-6.

At the ED, Petitioner reported that he had received a flu vaccine two weeks prior, then developed an upper respiratory infection, followed by increased sensitivity in all extremities. Ex. 2 at 151. He later developed weakness in all extremities, with his symptoms getting progressively worse. *Id*. He had difficulty getting out of bed and standing, lacked strength, and felt "almost paralyzed." *Id*. at 151, 158. On examination,

he had slightly decreased sensation to all four distal extremities and absent patellar/biceps and brachioradialis reflexes. *Id*. at 153. He was admitted for further evaluation, with GBS noted as a "likely diagnosis." *Id*. at 155-56.

Petitioner saw neurologist Kenneth Hoj, M.D., on the day of his hospital admission. Ex. 2 at 133. On examination, Petitioner's reflexes were absent. *Id*. at 136. Dr. Hoj's impression was that Petitioner probably had GBS, and he ordered MRIs of the spine and brain and a lumbar puncture. *Id*. A lumbar puncture showed increased protein, confirming the GBS diagnosis. *Id*. at 138-39, 201. IVIG treatment was ordered. *Id*. at 138.

Early in his hospitalization, Petitioner was evaluated by physical medicine and rehabilitation specialist Travis O'Brien, M.D. Ex. 2 at 137. Dr. O'Brien noted that Petitioner was previously functioning independently and working full time in auto sales. *Id*. Petitioner reported that he had a wife and two strong teenage sons who could help him at home if needed. *Id*. Dr. O'Brien thought Petitioner may be able to go home at discharge (rather than to inpatient rehabilitation) due to his mild strength deficits and excellent support at home. *Id*. at 138.

Petitioner saw Dr. Hoj again on December 22, 2022. Ex. 2 at 201. Petitioner was feeling stronger and tolerating IVIG. *Id*. at 203. On examination, he had trace brachioradialis, triceps, and knee reflexes; other reflexes remained absent. *Id*. Dr. Hoj noted "significant improvement in strength," with his predominant weakness remaining in his deltoid. *Id*. at 204.

Petitioner was hospitalized from December 19 - 23, 2022, and completed four days of IVIG treatment. Ex. 2 at 144, 172. His lab results showed positive GQ1B antibodies, which his neurologist thought could suggest he had the Miller-Fisher variant of GBS. *Id*. at 145. Outpatient physical therapy ("PT") was recommended. *Id*. at 147.

A week after his hospital discharge (December 30, 2022), Petitioner saw Madeleine Grosland Sather, M.D., for a hospital follow up. Ex. 2 at 87. His neurological symptoms were "much improved from hospitalization." *Id*. His residual deficits were tiredness, tingling in his hands, which had improved and did not bother him much, and balance problems, for which he used a cane. *Id*. On examination, his gait was normal, and Dr. Sather noted that he did not need much support from the cane. *Id*. at 89.

Almost three weeks after his discharge from the hospital (January 11, 2023), Petitioner saw neurologist John Trusheim, M.D., for an outpatient consultation. Ex. 2 at 31. Petitioner's upper extremity numbness had reduced substantially, and his weakness was "relatively minor," though he remained easily fatigued. *Id*. On examination, Petitioner's upper extremity strength was "essentially normal," with some subjective weakness in his left upper extremity. *Id*. at 33. Petitioner reported some mild tingling paresthesia, though this was "markedly improved." *Id*. Dr. Trusheim noted his gait as "independent without ataxia." *Id*. Petitioner's reflexes continued to be reduced. *Id*. Dr. Trusheim assessed Petitioner with the Miller-Fisher variant of GBS, and remarked that

he was "making an excellent convalescence at this point," with some residual deficits. *Id*. at 34. Dr. Trusheim recommended that he defer vaccinations in the immediate future, and return in three to six months. *Id*.

The same day, Petitioner underwent a PT evaluation. Ex. 2 at 39. The therapist noted his GBS diagnosis, and observed that he was slowly returning to his baseline but continued to demonstrate deficits with balance, activity tolerance, and upper and lower body strength. *Id*. His range of motion and coordination were within functional limits, but he continued to experience numbness and tingling in his fingertips. *Id*. Petitioner walked with a cane and exhibited functional limitations with walking extended periods or on uneven ground. *Id*. Petitioner reported that he was back to working about six or seven hours a day, usually seven days a week. *Id*. at 40. He stated that overall, he was doing well and felt he was returning to his prior level of function. *Id*. Petitioner reported a pain level of three out of ten, describing it as an intermittent ache in his left shoulder and arm. *Id*. His treatment plan was two PT sessions a week for eight weeks. *Id*. at 43. Petitioner underwent a second PT session two days later, on January 13, 2023, but did not return to PT thereafter. Ex. 2 at 16.

Over five months later, Petitioner returned to Dr. Trusheim on June 20, 2023. Ex. 3 at 94. Petitioner reported he had been making "excellent progress" with resolution of his double vision, but remained easily fatigued. *Id*. at 95. His coordination problems and upper extremity numbness had improved substantially, and weakness was "relatively minor." *Id*. Petitioner's primary concern was his easy fatigability, which prevented his full return to activities including sports and may have limited his work ability. *Id*. Petitioner also reported increased awareness of what Dr. Trusheim though were likely benign cardiac arrhythmias. *Id*.

On examination, Petitioner's upper extremity strength was "essentially normal," with slight proximal shoulder weakness. Ex. 3 at 97. Petitioner reported some minor tingling in the shoulder/upper thoracic area and mild incoordination in his left upper extremity. *Id*. His reflexes remained reduced and difficult to obtain. *Id*. Dr. Trusheim thought Petitioner's ongoing fatigue was "well within the expected convalescence" and noted that Petitioner agreed that there was "no motor or sensory task unavailable to him today that was previously possible." *Id*. Petitioner's symptoms had improved significantly, and Dr. Trusheim did not think further imaging or laboratory studies were needed. *Id*. He prescribed a medication to help with fatigue, and referred Petitioner to a cardiologist. *Id*.

The following month (July 13, 2023), Petitioner saw cardiologist Richard Bae, M.D. Ex. 2 at 73. Petitioner reported a history of occasional brief palpitations that increased following his GBS. *Id*. at 74. Dr. Bae informed Petitioner that this type of palpitation is typically benign, though its manifestations can be bothersome. *Id*. at 75. He recommended further evaluation to ascertain whether medication was warranted. *Id*.

Petitioner followed up with Dr. Trusheim on August 22, 2023. Ex. 3 at 51. He continued to be limited in strength and endurance, reporting that he recently helped move his children into college and could only help with moving furniture "to a very slight extent." *Id*. at 52. He was now working 50 hours a week. *Id*. His primary concern remained his easy fatigability, which the medication Dr. Trusheim prescribed in June may have helped slightly. *Id*. Dr. Trusheim noted that Petitioner "may be limiting his recovery at this point to some degree by overwork/exhaustion." *Id*. at 55.

The following week (August 29, 2023), Petitioner saw cardiologist Victor Cheng, M.D. Ex. 3 at 38. Petitioner continued to be bothered by palpitations. Dr. Cheng thought his GBS may have triggered the condition, and prescribed medication. *Id*. at 40-41. Six months later (February 26, 2024), Petitioner saw his PCP for an annual physical. Ex. 8 at 18. Petitioner reported mild persisting GBS symptoms, including "sometimes tingling in the hands" and palpitations for which he was taking medication. *Id*. No abnormalities were noted on his neurological exam. *Id*. at 21.

### b. Testimonial Evidence

Petitioner filed a declaration in support of his claim.[3] Ex. 5. In early December 2022, he became ill with respiratory symptoms, followed by numbness and tingling in his hands and forearms. *Id*. at ¶ 2-4. While at work on December 16, 2022, he "noticed a substantial difference in the severity of [his] symptoms," and his co-workers noticed a change in his behavior. *Id*. at ¶ 5. His arms were now completely numb, with tingling up to his shoulders, his strength and coordination were waning, and his speech was impaired. *Id*. He was concerned he could be having a stroke and called the clinic where he had been seen recently; a nurse directed him to go to the ED as soon as possible. *Id*.

Petitioner went to the ED, where he saw a triage nurse and then "waited for several hours without being seen" before leaving to go to an urgent care facility. Ex. 5 at ¶¶ 6, 7. The doctor there determined he was not having a stroke, and sent him back to the ED. *Id*. at ¶ 7. He returned to the ED and waited another two hours without being seen, then went home. *Id*.

The next day (December 17, 2022), Petitioner and his family began their drive to see family for Christmas. Ex. 5 at ¶ 8. On the way, they stopped at a different hospital, both because he was getting worse and because he thought it would be easier to be seen at a smaller hospital. *Id*. The doctor at that hospital thought he had GBS, but could not confirm the diagnosis without further testing. *Id*. Petitioner decided to wait a couple of days for further evaluation. *Id*.

---

[3] Although Petitioner labeled Exhibit 5, as well as Exhibits 6 and 7, as affidavits, they are not notarized. Nonetheless, they are acceptable as declarations sworn to under penalty of perjury. 28 U.S.C. § 1746.

The following day (December 18, 2022), Petitioner's condition continued to worsen, and he could not sit up or get out of bed without assistance. Ex. 5 at ¶ 9. He and his family left their relatives' home and returned home early because his condition was "going downhill quickly." *Id*. The next day, he was taken to the hospital by ambulance and admitted. *Id*. at ¶¶ 10, 11.

Petitioner explains that when his GBS diagnosis was confirmed, "[t]ime basically stood still, and I was unaware of what my future would look like. My mortality came into question." Ex. 5 at ¶ 12. He underwent IVIG, which "sucked every last bit of energy" he had remaining. *Id*. These were "very dark times" as he and his family were unsure what the future held. *Id*. at ¶ 13. He adds that his medical records describe his treatment course, but "nothing can appropriately describe the hell I experienced during this time." *Id*.

Over the next seven months, Petitioner states that there was "little to no change" in many of the physical and emotional aspects of GBS. Ex. 5 at ¶ 14. Some improved, but others, such as excessive fatigue, lack of coordination, loss of strength, and numbness and tingling, lingered and "changed me forever." *Id*. Petitioner reflects that he has "missed out on so much in a very short period of time," with his oldest child graduating from college and his twins graduating from high school in 2023. *Id*. at ¶ 15. He feels he cannot keep up and has become a hindrance to family, friends, and co-workers. *Id*. He has missed family events, social activities, travel, and work due to ongoing weakness and fatigue. *Id*. Medications have improved some of his residual symptoms, but he did not need those medications prior to his GBS. *Id*. at ¶ 17.

Petitioner states that GBS has also "tortured me" professionally. Ex. 5 at ¶ 16. Prior to his illness, he was promoted in his first 11 months with his current employer and "was being fast-tracked for further promotions" – which have now halted due to his inability to perform some physical tasks. *Id*.

Petitioner states he has also been affected emotionally and psychologically by his GBS. Ex. 5 at ¶ 17. Previously, he was extremely active, healthy, and energetic, and always willing to assist others; he feels he now lacks that ability and desire. *Id*. He is limited both in what he can do and in how long he can do it. *Id*. All four of his children moved in the year after his GBS, and other than helping them pack he was "basically limited to being a bystander." *Id*. He is not the same person, and his life is not the same, since his illness, and his entire family has been affected. *Id*. His quality of life is "a fraction" of what it was previously. *Id*. at ¶ 18.

Amy Woodward, Petitioner's wife, also filed a declaration in support of his claim. Ex. 7. She explains that Petitioner declined a lumbar puncture at the hospital they went to on December 17, 2022 because "they did not have the capability to use an ultrasound to direct the needle," and they were not comfortable without that. *Id*. at ¶ 6. On the drive that day, they stopped for food, and Petitioner "nearly choked" on his burger, and had

problems swallowing his drink. *Id*. at ¶ 7. When they arrived at her parents' house, he went straight to bed to lay down. *Id*. They left early as he seemed to be worsening, and was unable to walk without assistance. *Id*.

Once Petitioner was admitted to the hospital and diagnosed, Ms. Woodward recalls, the "next two days were the scariest of my life." Ex. 7 at ¶ 9. Christmas was a few days away, two big winter storms were coming, and she worried she may not be able to get back to the hospital. *Id*. She had no idea how sick he really was, and "was scared I would have to call our four children and give them really, really bad news." *Id*. As a result, she decided not to go home, and quickly bought some clothing and necessities to keep in the hospital with her. *Id*. at ¶ 10. She made arrangements for her children to visit relatives before the storm so they would not be alone on Christmas. *Id*.

Ms. Woodward states that Petitioner felt "like his body had been hit by a truck." Ex. 7 at ¶ 11. He could not sit up without assistance, was not able to eat or get much rest, and was in pain all over. *Id*. She helped him shower, which he hated because water touching his skin felt like "needles all over." *Id*. at ¶ 12. Whenever she touched him, he said it felt almost like small tingling needles poking him. *Id*. at ¶ 13.

Ms. Woodward further states that when Petitioner was discharged, they went to his sister's house, where their children were, and getting him there was a "monumental feat." Ex. 7 at ¶ 14. When they arrived, he was happy to see the kids, but went right to bed and slept almost 14 hours. *Id*. The next day, she bought him a cane because "he could not walk without it." *Id*. at ¶ 15. He remained tired, and could not go up and down stairs. *Id*. When they returned home, his sons helped him up the stairs. *Id*. at ¶ 16.

Ms. Woodward states that the neurologist Petitioner saw in January 2023 told them it would take time for him to recover, from three months to three years. Ex. 7 at ¶ 19. Petitioner continued using a cane to walk, and returned to work part time. *Id*. at ¶ 20. He attended two formal PT sessions, then continued with a home exercise program every other day if he was not too tired. *Id*. at ¶¶ 20, 24. In February 2023, the only time he left the house was to go to work, still on a reduced basis. *Id*. at ¶ 21. He became anxious and short-tempered, and felt helpless to do things around the house he normally did. *Id*.

By April 2023, Ms. Woodward recalls, Petitioner was finally able to walk without a cane. Ex. 7 at ¶ 23. He struggled with routine tasks such as taking out the trash. *Id*. Prior to his illness, he normally cooked for the family; afterward, however, he could no longer cook. *Id*. He felt as though he was a burden, putting a strain on their relationship. *Id*.

Ms. Woodward states that Petitioner was an avid golfer. Ex. 7 at ¶ 25. He tried golfing one day after work, and came home and went straight to bed, remaining "miserable" for the next three days. *Id*. He continued to experience "incredible fatigue." *Id*. at ¶ 26. In the summer of 2023, he could not mow the lawn or do other household tasks when he came home from work. *Id*. His mood and mental health deteriorated, and "it felt like he was a completely different person." *Id*.

By the fall of 2023, Petitioner seemed to have a bit more strength, but continued to tire easily. Ex. 7 at ¶ 28. When their children moved in August and December 2023, he was "forced to stand on the sidelines and watch," and she asked her parents to help. *Id*. He is "not the same happy, outgoing, jokester that I married." *Id*. It has been "extremely difficult and strenuous" on their relationship. *Id*.

## II.   Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining GBS damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I-II of *Congdon v. Sec'y of Health & Human Servs*., No. 23-2025V, 2025 WL 2734068, at *1-4 (Fed. Cl. Spec. Mstr. Aug. 21, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4]

## III.   The Parties' Arguments

Petitioner seeks a pain and suffering award of $160,000.00, citing *Longo v. Sec'y of Health & Human Servs*., No. 21-844V, 2023 WL 9326039 (Fed. Cl. Spec. Mstr. Dec. 20, 2023), and *Robinson v. Sec'y of Health & Human Servs*., No. 18-0088V, 2020 WL 5820967 (Fed. Cl. Spec. Mstr. Aug. 27, 2020) – cases in which that amount was specifically awarded. Petitioner's Memorandum in Support of Damages, filed Dec. 6, 2024, at *32-36 (ECF No. 28) ("Mem.").

Petitioner argues that he has endured considerable pain, suffering, and emotional distress due to his GBS. Mem. at *28. His treatment course included four ED visits, one urgent care visit, a five-day hospitalization with a four-day course of IVIG, three outpatient follow-up neurology appointments, and two formal PT sessions. *Id*. at *28-30. Petitioner asserts that he has documented GBS sequelae extending to 15 months after vaccination

---

[4] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

in the form of his February 2024 PCP visit noting mild persisting symptoms with some tingling in his hands. *Id*. at *30. His illness had an "overwhelming and lasting impact" on his career, and Petitioner asks that this be considered in evaluating his overall pain, suffering, and emotional distress, citing *Dillenbeck v. Sec'y of Health & Human Servs*., No. 17-428V, 2019 WL 4072069, at *14 (Fed. Cl. Spec. Mstr. July 29, 2019), *aff'd in part and remanded*, 147 Fed. Cl. 131 (2020). *Id*. He asserts that his GBS had an overwhelming impact on his quality of life, including a loss of independence and social isolation. *Id*. at *31-32.

When he returned to work, he did so in a part time capacity at first, and required some accommodations, including the ability to sit while training. Mem. at *34. Like the petitioners in *Longo* and *Robinson*, he required inpatient hospitalization and outpatient PT, with residual GBS symptoms for over a year and neurological follow-up. *Id*. at *34-35. Although he did not require inpatient rehabilitation, Petitioner believes that this may have been required if he did not have two healthy adult sons at home able to help him. *Id*. at *36. And like the *Robinson* petitioner, Mr. Woodward experienced changes to his professional life. *Id*. at *35.

Respondent proposes a lesser pain and suffering award of $77,500.00. Damages Response, filed Jan. 22, 2025, at *9 (ECF No. 29) ("Resp."). Respondent does not cite any precedent in support of this award, but states that he has "reviewed a number of conceded flu/GBS cases and considers $77,500.00 to be an appropriate pain and suffering award given the facts of this case." Resp. at *9.

Respondent argues that Petitioner's clinical course and treatment demonstrate a less severe course of GBS, comparatively speaking. Resp. at *7. While some GBS patients require extensive and lengthy hospitalization, Petitioner was in the hospital for five days, and was discharged home rather than to an inpatient rehabilitation facility. *Id*. After discharge, Respondent asserts that "petitioner's treatment course was extremely brief," consisting of two outpatient PT sessions and three neurologist follow-up appointments. *Id*. at *7-8.

Although Petitioner asserts that he experienced a loss of physical independence and social isolation resulting from his GBS, Respondent argues this is not supported by the record. Resp. at *8. Respondent notes that "[t]he substantial bulk of petitioner's neurologic care occurred during the immediate month after his flu vaccination and subsequent GBS diagnosis and hospitalization." *Id*. This was followed by a good recovery, and no diagnosis of permanent disability. *Id*.

Respondent points out that just seven days after Petitioner was discharged from the hospital (35 days after vaccination), a physical examination revealed a normal gait and "much improved" symptoms. Resp. at *8. By seven months post-vaccination, Petitioner's symptoms had "improved significantly" and Petitioner agreed that there was "no motor or sensory task unavailable to him that was previously possible." *Id*. (citing Ex.

9

3 at 97). Although Petitioner argues that his career was negatively impacted by his GBS, Respondent notes that nine months after vaccination, Petitioner had returned to work approximately 50 hours a week, and his neurologist noted that he "may be limiting his recovery at this point to some degree by overwork/exhaustion." *Id*. (citing Ex. 3 at 55).

Petitioner's course was, in Respondent's view, less severe than what was experienced by the claimants in *Robinson* or *Longo*, warranting a lower award. Resp. at *8. The *Robinson* petitioner had more significant initial symptoms, underwent two lumbar punctures (one unsuccessful), suffered a pulmonary embolism, and completed 20 sessions of outpatient PT. *Id*. at *9. The *Longo* petitioner completed 36 sessions of outpatient PT and required a rolling walker after hospital discharge. *Id*.

Petitioner replies that Respondent "has not offered *any* reasoned GBS damages decisions to support his proposed award," leaving his proposed award "unsupported and unpersuasive." Petitioner's Reply, filed Feb. 5, 2025, at *2-3 (ECF No. 31) ("Reply"). Petitioner infers that Respondent appears to be using awards in cases resolved by proffer, since "there are no reasoned damages decisions supporting a value of $77,500.00 for pain and suffering in GBS cases." *Id*. at *3. Petitioner notes that the court has previously rejected Respondent's argument that amounts awarded in proffered cases are a more accurate gauge of an appropriate award than reasoned decisions, citing *Sakovits v. Sec'y of Health & Human Servs*., No. 17-1028V, 2020 WL 3729420 at *4 (Fed. Cl. Spec. Mstr. June 4, 2020). *Id*. at *3-4.

In contrast, Petitioner stresses that he has cited precedent to support his requested award. Reply at *4. Petitioner asserts that the similarity of his claim and the cases he cites is that "they all experienced the serious, uncertain and frightening nature of GBS during the initial weeks and months of their diagnosis, requiring inpatient hospitalization and outpatient physical therapy." *Id*. And Petitioner notes that he took the lack of inpatient rehabilitation into consideration in offering comparable cases. *Id*.

### IV.   Appropriate Compensation for Petitioner's Pain and Suffering

In this case, Petitioner's awareness of his injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his GBS. Therefore, my analysis focuses primarily on the severity and duration of Petitioner's injury.

Petitioner made several ED visits at the beginning of his illness, although this appears to be in part due to his decision to leave the hospital due to lengthy wait times. The record also reflects that Petitioner experienced mild residual effects for 15 months, although there were multiple lengthy gaps in treatment. For the majority of that time, however, his symptoms were relatively minor.

Thus, a week after he was discharged from the hospital, Petitioner's gait was normal and although he used a cane to walk, his doctor noted he did not need much support from it. Ex. 2 at 87-89. Two weeks later, his upper extremity numbness had reduced substantially, and his weakness was relatively minor; his primary limiting symptom was fatigue. *Id*. at 31-34. At seven months, Petitioner agreed that his residual symptoms did not prevent him from doing any motor or sensory tasks. Ex. 3 at 97. Petitioner did, however, require two new medications, one for fatigue and one for a cardiac problem that his cardiologist thought may have been triggered by his GBS. Ex. 3 at 38, 97.

Overall, the record establishes that Petitioner suffered a relatively mild GBS illness that required a five-day hospitalization, four IVIG treatments, two outpatient PT sessions, and three outpatient neurology follow ups. His neurologist prescribed a medication for his fatigue, and his cardiologist prescribed a medication for a cardiac condition that the doctor thought may have been triggered by his GBS. I acknowledge, however, that even a relatively mild case of GBS is serious and frightening, and I consider that fact in determining the amount of Petitioner's pain and suffering award.

Petitioner's proposed comparable cases are not wholly on all fours with this case. The *Longo* and *Robinson* petitioners suffered more serious injuries and/or had more residual effects. Both of those petitioners underwent significantly more PT *over a several-month period*, and had residual effects lasting longer than Mr. Woodward. By contrast, Mr. Woodward attended two PT sessions within the span of less than a week – and thereafter did not seek *any* care again for over five months. Respondent, however, has not substantiated his proposed award by citing *any* reasoned decisions – and therefore I naturally start from the amounts Petitioner proposes, offsetting them appropriately rather than analyzing damages from the sum Respondent asserts is appropriate.

I decline to consider any impact on Petitioner's career in determining his pain and suffering award. *Dillenbeck* does not support Petitioner's position on these facts, nor does it suggest that it is appropriate in general to factor impact on a petitioner's career into a pain and suffering award. In *Dillenbeck*, I considered the petitioner's *distress* about her inability to continue working in her prior career in determining her pain and suffering award. *Dillenbeck,* 2019 WL 4072069, at *14. In other words, that claimant's distress about the loss of her career was an element of the pain and suffering she experienced. In contrast, Mr. Woodward was able to return to his former employment, part time at first and full time within nine months of vaccination. Although he asserts that he required accommodations and his career trajectory was altered, he has not established these allegations.

A recently-decided case, *Coleman v. Sec'y of Health & Human Servs*., No. 23-1141, 2025 WL 2855190 (Fed. Cl. Spec. Mstr. Sept. 5, 2025) (awarding $130,000.00 in pain and suffering), features a fact pattern with similarities to Petitioner's illness and treatment course. Both Mr. Woodward and the *Coleman* petitioner were hospitalized for

11

five days, underwent a lumbar puncture, treated with IVIG, attended a small number of outpatient PT sessions, and had a good recovery thereafter. Both used a cane to walk when they were discharged, and reported good progress, receiving most of their treatment within two months of vaccination. The *Coleman* petitioner, however, also spent three days in an inpatient rehabilitation facility, while Mr. Woodward did not; and the *Coleman* petitioner underwent one more IVIG treatment than Mr. Woodward, suggesting a somewhat worse illness. As a result, an award somewhat lower than *Coleman* is appropriate.

After considering the entire record and the parties' arguments, I find that **$125,000.00 in compensation for actual pain and suffering** is reasonable and appropriate in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $125,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[5] Additionally, I find that Petitioner is entitled to **$6,368.00 for lost wages and $318.23 for unreimbursed expenses** (amounts to which the parties have agreed).[6]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $131,686.23, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[7]

**IT IS SO ORDERED.**

                                                            **s/Brian H. Corcoran**
                                                            Brian H. Corcoran
                                                            Chief Special Master

---

[5] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[6] Mot. at *2 n.2, 37; Resp. at 2.

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.